ARTLESS ESTEY et al., Plaintiffs, *v.* SUSQUEHANNA PIPELINE COMPANY, INC., Defendant.

Supreme Court, Equity Term, Onondaga County, March 31, 1950.

*Cleveland J. Kenyon* for plaintiffs.

*A. V. W. Hancock* for defendant.

SEARL, J. Plaintiffs have for many years been the owners of a farm located in the town of Tully, Onondaga County, New York. In December, 1947, Sun Pipeline Company, Inc., was merged into Susquehanna Pipeline Company, Inc., and assumed any and all liability of the former company. For convenience, defendant and its predecessor will be termed " the company."

In 1931, the company was installing a pipe line for the conveyance of gasoline from Marcus Hook, Pennsylvania, to the Barge Canal Terminal outside the western limits of the city of Syracuse. On the 15th day of January, 1931, an agreement was executed between the plaintiffs and Sun Pipeline, Inc., providing for the grant of an easement and right of way across plaintiffs' lands for the installation, maintenance, repair and operation of one steel pipe, six and five-eighths inches outside measurement, weighing 19.97 pounds per foot, with welded joints, placed in a trench twelve inches wide, to be dug with a digging machine six feet wide over all, or by hand. The pipe was to be covered not less than twenty-four inches with dirt, the dirt to be replaced in the trench by machine and by hand and left six inches above the normal level of the ground to allow for settling. The agreement further provided that all surplus dirt and stone was to be removed, the ground to be left clear and all fences replaced, the top soil not to be replaced as top soil, the total depth of the trench to be from thirty to thirty-six inches. At ditches and places where the line was subject to damage, the depth of the trench could be greater according to the protection needed. The agreement further provided that the line be constructed and maintained in such manner as not to prevent or interfere with the drainage of plaintiff's farm or adjoining land, or with any open ditch required for draining purposes. The grantee, Sun Pipeline, Inc., agreed to use the right of way in such a manner as to not unnecessarily interfere with the grantor's use of the premises and to pay any damages that might arise to the grantor's lands adjoining the pipe line, or to crops, fences, drains or buildings, either from installation, maintenance, or operation of the pipe line. The grantee agreed to patrol the line twice a week and at such other times as it might be in need of inspection in order to insure safety. Further, the easement, or right of way, was defined as a strip of land twelve feet in width between parallel lines, each six feet measured at right angles on each side of, and parallel to, the center line.

It appears that shortly thereafter, the Sun Pipeline Company, Inc., constructed the pipe line in a trench twelve inches wide

and commenced operations by using the same for the transportation of gasoline and petroleum products. The line apparently functioned satisfactorily until the year 1940, when it was found that the acidity of the soil at certain points along the pipeline caused pitting in the steel pipe, and threatened, if continued, to cause leakage and damage. Accordingly, in the year 1940, the defendant, at certain points along its right of way, including that portion of the pipe line which ran through the so-called ''bottom land'' of plaintiff, encased the pipe within a twelve inch square wooden box and surrounded the pipe with a material intended to prevent further pitting. The evidence disclosed that in the first instance, Sun Pipeline Company, Inc. paid to these plaintiffs as a consideration for the easement the sum of $2,381.10. When the work was done in 1940, an additional sum of $50 was paid to the plaintiffs for any damage that the plaintiffs suffered in that particular repair operation.

From the time the original pipe line was installed in 1931, and since the boxing of the pipe in 1940, a coating for pipes has been discovered, a patented product known as '' Somastic.'' When applied to the outer surface of metal pipes, this cement-like covering apparently effectually prevents further deterioration by pitting due to an acid soil condition.

The repair operation was commenced by defendant at a point south of plaintiffs' farm land and continued northward toward Syracuse. On or about August 22, 1946, defendant moved its equipment necessary for this work upon plaintiffs' property. The covering of the pipe extending through this farm for a distance of 2,080 feet over defendant's right of way was completed some twenty days later. The work was accomplished by use of a specially built machine some twenty feet in width which held the pipe after it was raised from its trench, intact. First, the outer surface of the pipe was cleaned and polished by a system of revolving wire brushes. The same machine contained a heating apparatus which melted to a volatile state, by a high degree of heat, the so-called '' Somastic ''. This was automatically applied by the operation of the same machine to the outside of the pipe to the thickness of 7/16 of an inch. Doubling this would increase the outside diameter of the pipe from 6⅝ inches, as originally installed, to 7½ inches. The evidence fairly discloses, however, that this substance is not deleterious to crop raising or proper husbandry, so far as the operation of the farm is concerned. The pipe returned to its trench is not sufficiently

close to the surface to interfere with plowing, cultivating, nor fitting of the soil.

As to the pleadings: Plaintiffs' original complaint set forth two alleged causes of action. The first alleged that the work performed by defendant in 1946 was done without consent of the plaintiffs, that it constituted a trespass. The complaint asked a declaratory judgment to effect that the operation violated plaintiffs' property rights and was in excess of rights granted defendant in the original agreement of 1931. The complaint asked a judgment directing defendant to remove the '' Somastic '' coating.

The second cause of action sought $8,500 damages alleged to have been sustained by reason of the work performed by defendant in 1946.

An amended complaint was served in which a mandatory injunction and restraining order was demanded in addition to the relief sought in the original complaint.

The answer alleges that plaintiffs granted a right of way and license to defendant to perform the acts complained of, as well as laches, and that an adequate remedy at law exists.

We must start our consideration of the merits of plaintiffs' claims with the knowledge that defendant is a pipe line corporation as defined by section 80 of the Transportation Corporations Law '' to construct and operate '' as well as '' to maintain and operate for public use ''—'' lines of pipe for conveying or transporting therein petroleum, gas, liquids or any products or property.'' Section 81 permits such corporation to lay out its route not exceeding twelve feet in width and in case of its inability to agree for the purchase of any real property to acquire title thereto by condemnation, subject to certain restrictions including buildings, dooryards, lawn, garden or orchard.

Granting that defendant caused some damage to plaintiffs' property in this 1946 operation, to be referred to later more in detail, it is proper to consider first whether there was a willful trespass on the property, and second, whether there is evidence justifying a conclusion that such trespass is likely to be repeated. The evidence discloses that prior to the arrival of the equipment on plaintiffs' premises in 1946, a representative of defendant called on plaintiffs, telling them that the application of the coating to the line would require more than a twelve-foot right of way. Plaintiffs voluntarily cut a forty foot strip east of the pipe line through their ten-acre field, apparently for the use of

defendant's employees and machinery. Mr. Estey saw the heavy machinery unloaded at the Tully station near his property, saw it used on his property during the two weeks of the operation, without protest, except to caution against leaving the gates open. The representatives of defendant told Mr. Estey that a strip in excess of the width of the right of way would be necessary to raise and work on the pipe. His response was to go ahead but be careful of the cows.

Defendant maintains the implied consent amounted to a license and that plaintiffs' acts and conduct amount to an equitable estoppel to a claim of willful trespass. (*Andrews* v. *Cohen,* 221 N. Y. 148.)

The defendant comes into court acknowledging responsibility, however, for any legal damage directly and proximately attributable to any of its acts in such an amount and to such an extent as the proof establishes.

Defendant's predecessor agreed by the terms of the original agreement of January 15, 1931, '' to pay any damages which may arise to the grantor's land adjoining said pipeline, or to crops, fences, drains or buildings on this said premises from the installation, maintenance and operation of said pipeline.''

The court finds that plaintiffs should properly be compensated for crop damage on the ten-acre field on the south side of the farm, as well as to the seven-acre field, damage to pasture lands, work in cleaning up fields and right of way, as contained in certain of plaintiffs' requests to find, together with the fair market value of a two-year-old heifer claimed to have been rendered valueless except for beef as a result of becoming mired in a hole in the bog of the so-called '' bottom-land,'' due to the operations of defendant's heavy equipment. Veterinarian's fees for care of the heifer are also allowed.

An item of damage for fright claimed to have been caused to plaintiffs' cows this court must disallow. It is conceded that the action of the steel brushes attached to the cleaning machine caused a rasping, scraping noise that could be heard for a considerable distance; plaintiffs urge that this noise caused the cows to become nervous and uneasy. The witnesses for plaintiffs concluded from the fact that the cows were restless in their stanchions, tended to resist the milking cups, stayed near the barn, that they suffered from fright caused by the unusual noise. One witness stated that in his opinion the value of the herd had been reduced $2,000 in October, 1946, because of this

condition, concluding the same came from fright. There was no claim but that such a condition was temporary only. Further, there is no proof as to whether the noise of the cleaning machine, or the presence of the workmen on defendant's right of way, caused the uneasiness to the cows. This court has been unable to find any authority holding that the feelings of a cow can create a cause for monetary remuneration to her owner. Fright of a human being, unaccompanied by contact, does not constitute a cause of action. Animals should not be granted more consideration. The only authority dealing with a comparable condition is *Hawley* v. *Pittsburg, Titusville & Buffalo R. R. Co.* (34 Hun 623, opinion in 20 N. Y. Week Dig. 142). This decision reverses a finding for loss of milk claimed to have been caused by fright. In any event, the court is not convinced that damage, if any, was caused in the instant case through fright.

Defendant herein claims no prescriptive rights and only such as are granted by the original agreement. It is urged by defendant, however, that the privilege of maintenance and repair granted under the terms of the agreement " of one steel pipe " carries with it as a necessary incident of the grant the right to any type of repairs that permits the defendant to enjoy the privilege paid for, a privilege that inures not only to the company but to plaintiffs as well, as a protection against leakage and against the risk of fire. We find the gist of the right to repair found in *Herman* v. *Roberts* (119 N. Y. 37, 42) wherein the court writes: " The grantee thus acquired the right to enter upon the land and construct such a road-bed as he desired and to keep the same in repair. He could break up the soil, level irregularities, fill up depressions, blast rocks and not only remove impediments, but supply deficiencies in order to constitute a good road."

Plaintiffs request a finding that defendant's application of the Somastic covering is a capital investment; that its application was not ordinary repair and maintenance, and that plaintiffs be granted a mandatory injunction directing defendant to remove the Somastic coating and pay damages for its unlawful application. The contention of plaintiffs is that the rights of defendant are limited to the life of one steel pipe only for such a period of years as may permit the acidity of the soil in certain spots to completely penetrate the thickness of the pipe; when that happens and the pipe commences to leak, plaintiffs urge it cannot be replaced and defendant's right of way must be abandoned.

In these times, when transportation is a problem, and gasoline is so vital to our commerce, no answer to this argument seems necessary.

Should there be any ambiguity as to the meaning or interpretation of the original agreement, the court must construe it according to the intent of the parties. The agreement was drawn by plaintiffs. Any conflict by way of inference must be in favor of defendant. (Real Property Law, § 240, subd. 3; *O'Neil Supply Co.* v. *Petroleum Heat & Power Co.*, 280 N. Y. 50, 55.) If there is uncertainty as to rights reserved to grantors such doubts are to be resolved in favor of the defendant. (*Mitchell* v. *Reid,* 192 N. Y. 255, 263.) It does not seem reasonable that had the steel company that manufactured the pipe delivered several lengths to defendant that were defective that the company should be forced to abandon its line. The expense necessary to acquire a right of way and construct a line from New Jersey to Syracuse hardly would call for such an interpretation. Public safety and security could not well countenance a leaky pipe line.

Witness Bryan testified that in 1938 he invented the machine employed by defendant in cleaning the pipe and applying the Somastic covering. This material is nonvolatile, noncorrosive and insoluble. Various methods of repair had been employed by defendant to repair pits in the pipe where it extended through the bottom land on plaintiffs' premises, due to the corrosive action of the soil. Mr. Bryan testified that application of the material was generally adopted in various parts of the country where similar conditions had arisen and that for ten years since it has been used commercially it has prevented decay. No contradictory testimony was given to effect that the measures used need ever be repeated. Thus, the court is justified in concluding that no future or repeated trespass can properly be anticipated.

The increase in the size of the pipe from a diameter of 6⅝ inches to 7½ inches, including the coating, according to the evidence, all within defendant's right of way, caused no damage to plaintiffs' farm.

A more difficult situation is presented in regard to the depth to which the pipe in its repaired condition has been replaced in the trench. The agreement provides that the total depth of the trench " to be from 30 to 36 inches." It is apparent that in cultivated fields the pipe should be at a depth sufficient to avoid contact with plow points and other ordinary farm equipment. At some points where the pipe has been relaid, excluding

the distance where it passes through the so-called "bottom-land", the depth of soil does not exceed thirteen inches. There has been no proof. offered that lack of depth beyond thirteen inches has interfered with the usual and proper cultivation and use of the land, nor that it threatens to.

I have just referred to the expression "bottom-land". This is a portion of land, approximately 5½ acres, low, a bit swampy, covered with bunch grass and occasional willow growth located easterly of the pipe line. This area is pear shaped with the neck of the pear affording the drainage of this 5½ acres and terminating in a ditch three to four feet in width which crosses the pipe line and drains to the west and thence off from plaintiffs' farm. Early in each year, after the floods from winter snows have passed, Mr. Estey testified he used this area as early pasture for his cattle. The testimony and map of defendant's surveyor, who went over this property prior to the original construction of the line, as well as United States Geographical maps, together with elevations established and aerial photographs, disclose the fact that this particular area was, prior to the installation of the pipe line, more or less swampy. Where the outlet crosses the pipe line there is both surface and subsurface drainage to the west. At this point the top of the pipe line, as relaid is only eleven inches below the level of the ground on either side of the drainage ditch. Under the terms of the right of way agreement the pipe was to be " covered not less than twenty-four inches with dirt, and laid, constructed and maintained in such a manner as not to prevent or interfere with the drainage of the Grantor's farm or adjoining land, or with any open ditch required for draining purposes." It is clear that any pipe, regardless of whether the size of a pencil, whether 6 5/16 inches or 7½ inches in diameter, would necessarily interfere to some extent, although perhaps inappreciably, with surface or subsurface drainage to the west at a point where the pipe crosses this drainage ditch, either above or below the bottom of the ditch. Even though the pipe should be raised to cross this ditch above the surface of the water, such result would violate the provision that it be " covered not less than 24 inches with dirt." Thus we are confronted with an impasse. Such a condition existed even before the pipe was removed for the purpose of applying the Somastic.

What is the equitable solution? Plaintiffs urge that if a syphon were constructed at this point they would be compelled

to clean it and remove dead animals or ice that might clog it. Various estimates have been made of the cost of further ditching to promote the drainage of this 5½ acres. The more practical way of handling the situation would be to cause defendant to pay plaintiffs for the fair and reasonable value of this limited acreage, equivalent in amount to what plaintiffs might reasonably be expected to receive in condemnation proceedings. Let the title and use thereof remain in plaintiffs, or their successors in title, to use as early pasture for cattle or any other farm purpose. The court is convinced that any impairment of drainage over what existed prior to defendant's operation in 1946 is infinitesimal. This solution will fully compensate plaintiffs for this particular item. A mandatory injunction will issue directing the defendant to remove the pipe or to replace it at this one particular point at the depth provided for in the agreement of January 15, 1931, unless within ten days after entry of judgment herein, and service of notice of entry thereof, the defendant deposits in the office of the Treasurer of Onondaga County to the credit of plaintiffs the sum of $1,375, which is found to be the full fair value of the 5½ acres. The County Treasurer of Onondaga County is directed to pay the same to plaintiffs or their order within ten days thereafter if within said period the plaintiffs deliver to said County Treasurer a general release, properly acknowledged by plaintiffs, binding themselves, their heirs, successors and assigns, and in form sufficient to be recorded, releasing defendant from all damage past and future as to the 5½ acres of plaintiffs so-called " bottom-lands ", properly described. If the plaintiffs fail to deliver said release as provided within such ten-day period the County Treasurer aforesaid is directed to return said sum, less his fees, to defendant, upon demand, and plaintiffs' rights to injunctive or other relief for any impairment of drainage as now exists referable to the 5½ acres shall terminate in either of these last two events. The court hereby determines the amount of past and future damages which the owners would sustain because of interference with the drainage of the " bottom lands " aforesaid and failure of defendant to cover not less than twenty-four inches with dirt, at the point where the pipe crosses the drainage ditch aforesaid, at the sum and to the amount of $1,375. In event of deposit of said amount with the Treasurer of Onondaga County, plaintiffs' right to a mandatory injunction shall terminate. (See *Westphal* v. *City of New York*, 177 N. Y. 140, as authority for this procedure.)

No damage has been caused to plaintiffs at other points along the right of way because of the fact that the pipe lacks a few inches of cover less than twenty-four. Such failure is inconsequential and does not interfere with use or cultivation of the land.

The court finds that the measure of compensation, namely $1,375, as to the " bottom land " to be the difference between the fair market value of the entire farm property without the encroachment or damage to drainage of the bottom land and the present market value of the property left with the pipe line as it now exists. (*Pappenheim* v. *Metropolitan Elevated Ry. Co.*, 128 N. Y. 436.) This compensation to plaintiffs is in addition to the damages hereinafter granted.

The measure of damages to plaintiffs' lands and property because of the trespass of defendant on plaintiffs' farm during the years 1946, 1947 and 1948, aside from damage to crops, cost of reseeding, fertilization, loss of the heifer and miscellaneous damage, such as failure to keep up fences, damage by cattle, etc., is the difference in usable or rental value of the farm without the trespass and that with the conditions imposed through acts of the defendant. (*Ewanski* v. *Solvay Process Co.*, 227 App. Div. 597.) The court is not unmindful that the terms " usable " and " rental " are not synonymous. Although the work was completed between August 22 and September 11, 1946, still a fence or gates were left down, pieces of the asphalt covering, or " Somastic ", were left littered around and minor resultant damage was caused to plaintiffs during the years 1947 and 1948. To fully compensate plaintiffs the court is considering the rental value as being affected for the entire three-year period. The court finds the loss of rental or usable value for the said period to be $450. This loss, together with damages awarded because of loss of crops in the ten-acre field, in the seven-acre field, construction and faulty maintenance by defendant of a forty-one foot gate, damage to land and seeding, as well as cost of lime, spreading the same, as well as fertilizer, removing boulders and other material, including all other damage claimed, excluding the sum of $1,375 covering permanent damage to the 5½ acre parcel referred to above, the court finds to be $2,750.62.

One question remains to be considered, that is, should a declaratory judgment be granted? Were the court to make no disposition as to either an injunction or declaratory judgment,

it is a grave question as to whether an award of damages only could be made in a purely equitable action. (See "A Century of Law-Equity Merger in New York " by Ralph E. Kharas, former Dean of Syracuse College of Law, 1 Syr. L. Rev., also, see *International Photo Rec. Mach.*, v. *Microstat Corp.*, 269 App. Div. 485, 489, to effect that " The weight of authority in this State is that where some ground of equitable jurisdiction is alleged in a complaint but fails of proof in its entire scope on the trial and it appears that there never was any substantial cause for equitable interference, the court will not retain the action and grant purely legal relief, but will dismiss the complaint.") To grant a mandatory injunction, as requested by plaintiffs, requiring defendant to again uncover the pipe and remove the Somastic, even were such an operation possible without destruction of the pipe, would be wrong. Such procedure would not only endanger public health but would be prejudicial to the interests of the plaintiffs, to say nothing of the injustice it would impose on defendant. Equity interferes in the transactions of men by preventive measures only when irreparable injury is threatened. (*Thomas* v. *Musical Mut. Protective Union,* 121 N. Y. 45, 57; also, see *Kane* v. *Walsh,* 295 N. Y. 198, 206.)

The question as to whether the application of the Somastic covering constitutes a repair or maintenance operation presents a jural question which the court in the exercise of discretion believes should be determined for future guidance. The former method of boxing the pipe in a twelve-inch box filled with asphalt to prevent further pitting, applied here and there, as soil corrosion demanded, would be far more detrimental to plaintiffs' interest than a single operation increasing the diameter of the pipe from $6\frac{5}{8}$ to $7\frac{1}{2}$ inches. The application of Somastic, put into general use after the pipe was originally laid, has filled and sealed the corroded spots. The argument that this was not an act of maintenance and repair cannot be approved. To hold that only the melting pot and soldering iron can be employed would be a restriction to horse and buggy methods. Modern inventive methods constantly appear. Regardless of method, the act still is one of repair and maintenance. The original agreement is hereby so construed. The right to employ reasonable methods of repair was implied in the agreement. The granting of a declaratory judgment relative thereto rests in the sound discretion of the court. (*Strobe* v. *Netherland Co.,* 245 App. Div. 573, 579; *Post* v. *Metropolitan Cas. Ins. Co.,* 227 App. Div. 156, affd. 254 N. Y. 541.)

A money judgment may be entered in the sum of $2,750.62 in favor of plaintiffs; the defendant is directed to deposit with the Treasurer of Onondaga County the additional sum of $1,375, in accordance with the provisions relating thereto as heretofore referred to. Also a declaratory judgment is directed in accordance with the above provisions, to the effect that the application of Somastic is found to be one of repair and maintenance, and may be entered by either party. Plaintiffs are entitled to the costs and disbursements of the action, to be taxed by the clerk, together with interest on $2,750.62, from the 22d day of August, 1946.

Judgment is granted in accordance with the provisions above set forth.